Johnny A. Johnson sued his employer, the City of Gadsden ("City"), on September 17, 1993, seeking to recover workers' compensation benefits for injuries he had sustained to his neck and back on February 15, 1993, *Page 1269 
during the course of his employment. Following an ore tenus proceeding on April 18, 1995, the trial court, on October 4, 1996, found, among other things, that the injuries sustained by Johnson had resulted in a 90% loss of earning capacity and a 90% vocational impairment. The court set the permanent partial disability benefits accordingly. The City moved to alter, amend, or vacate the judgment; the court denied its motion. The City appeals.
Initially, we note that because of the date of Johnson's injuries this case is governed by the new Workers' Compensation Act. The new Act provides that an appellate court's review of the proof and its consideration of other legal issues shall be without a presumption of correctness. § 25-5-81(e)(1), Ala. Code 1975. It further provides that when an appellate court reviews a trial court's findings of fact, those findings will not be reversed if they are supported by substantial evidence. § 25-5-81(e)(2), Ala. Code 1975. Our supreme court "has defined the term 'substantial evidence,' as it is used in §12-21-12(d), to mean 'evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.' " Ex parte Trinity Industries, Inc., 680 So.2d 262,268 (Ala. 1996), quoting West v. Founders Life Assurance Co. ofFlorida, 547 So.2d 870, 871 (Ala. 1989). Further, we "will view the facts in the light most favorable to the findings of the trial court." Whitsett v. BAMSI, Inc., 652 So.2d 287, 290
(Ala.Civ.App. 1994). This court has also concluded: "The new Act did not alter the rule that this court does not weigh the evidence before the trial court." Edwards v. Jesse Stutts,Inc., 655 So.2d 1012, 1014 (Ala.Civ.App. 1995).
Johnson had been employed with the City since 1970. At the time of the accident in February 1993, Johnson was employed as a security guard at the City airport. Johnson's job duties as a security guard also included janitorial work. Johnson was injured when he entered an office at the airport and stepped on a barbell. The barbell rolled out from under Johnson's foot and he was caused to fall onto a second barbell that was on the floor. The point of impact was Johnson's "tailbone." As a result of the fall, Johnson experienced pain in his neck, back, and left arm. He received medical treatment, which consisted primarily of anti-inflammatory medications and physical therapy, and his activities were restricted; however, his pain persisted.
Johnson, complaining primarily of pain in the neck and left arm and hand, was seen by Dr. Thomas L. Johnson on July 2, 1993. He also complained of some back pain; however, the back pain had improved through physical therapy. Dr. Johnson's examination revealed a limited range of motion in the cervical region, a positive Tinel's sign and Phalen's sign, which are an indication of carpel tunnel syndrome, and a decreased brachioradialis reflex on the left side. Dr. Johnson testified that these symptoms were indicative of a nerve root impingement to the cervical spine. Dr. Johnson's examination revealed no herniation in the lumbar region.
Johnson, still complaining primarily of pain in the neck and left arm and hand, was next seen by Dr. Johnson on July 16, 1993. Dr. Johnson's examination revealed a good range of motion in the cervical spine and some decreased grip strength in the left hand. On August 6, 1993, Dr. Johnson referred Johnson to Dr. Charles Clark. Dr. Clark first saw Johnson on August 18, 1993. Johnson complained of pain, numbness, and weakness in his left hand. Dr. Clark's examination, and a subsequent myelogram, revealed a ruptured disc at the C-6, C-7 vertebra. Dr. Clark, on August 26, 1993, performed an anterior cervical diskectomy and fusion on Johnson. Johnson was released to return to work, without restrictions, on October 18, 1993.
Dr. Johnson testified that while Johnson was under his care he made no findings that would indicate a herniated disc in the lumbar region. He stated that Johnson did have a bulging disc in the lumbar region, but that this was insignificant and attributed it to the aging process. Dr. Clark testified that Johnson never complained to him about back pain. Dr. Clark further stated that Johnson had a 5% permanent partial impairment rating *Page 1270 
based on the surgery that he had performed on Johnson.
Johnson testified that on October 19, 1993, the day after he returned to work, he reinjured his neck and shoulder while changing a flat tire at work.[1] Following this incident, Johnson was treated by Dr. Zenko Hrynkiw. An MRI of the cervical and lumbar spine revealed no herniation. Dr. Hrynkiw treated Johnson for a cervical radiculopathy and returned him to work on November 7, 1993, with a 30-pound lifting limit. During this period, surveillance was performed on Johnson's activities. He was observed engaging in a wide range of activities, including loading and unloading a lawn mower from his truck, walking for extended periods of time, and raking his yard.
Following his release from Dr. Hrynkiw, Johnson returned to work; he worked without complaining of any physical problems, until January 23, 1994, when he left work with pneumonia. He received short-term disability benefits and was hospitalized for most of February and March 1994 with pneumonia. He never returned to work with the City.
Subsequently, Johnson came under the care of Dr. James White, who performed several surgeries on Johnson — a lumbar laminectomy on April 8, 1994, to repair a ruptured lumbar disc; carpal tunnel surgery on Johnson's right hand on June 2, 1994; and surgery on Johnson's cervical spine at the C-6, C-7 vertebrae on July 19, 1994.[2] Johnson did not notify the City that he was receiving treatment from Dr. White.
Sheral Serafini performed a functional capacities evaluation on March 29, 1995, testing Johnson's body as a whole, including his neck, arms, back, legs, and hands. The functional capacities evaluation was used by vocational experts to prepare vocational evaluations. Jack Bentley, Johnson's vocational expert, performed a vocational evaluation and testified that Johnson was 100% vocationally disabled. Bentley stated that he had relied primarily on the functional capacities evaluation, because it provided the most recent data available to him and had been performed after Johnson had undergone the last three surgeries. Russ Gurley, the City's vocational expert, testified that Johnson was 71% to 81% vocationally disabled. Gurley, however, assigned a zero disability rating to Johnson for the injuries he had sustained in February 1993 and October 1993, because after those injuries Johnson had been able to return to work at his normal duties. He explained that the 71% to 81% rating was based on the results of the functional capacities evaluation — which accounted for Johnson's last three surgeries — as well as Johnson's age, training and education, income potential, and geographical location.
The City argues that the trial court's finding that Johnson had sustained a 90% loss of earning capacity as a result of the February 1993 injuries is not supported by the evidence. The measure of compensation for permanent partial disability is loss of earning capacity. U.S. Steel, A Div. of USX Corp. v.Nelson, 634 So.2d 134 (Ala.Civ.App. 1993). The assignment of the extent of disability *Page 1271 
is within the discretion of the trial court and cannot be disturbed on appeal if there is evidence to support that decision. Golden Poultry Co. v. Staggs, 660 So.2d 1348
(Ala.Civ.App. 1995). In reaching its decision, the trial court considers all of the evidence, including its own observations, and it interprets what it has heard and observed according to its own best judgment. Id.
After carefully reviewing the record, we conclude that the court's finding that Johnson had suffered a 90% loss of earning capacity as a result of the February 15, 1993, accident is not supported by the evidence. The evidence indicates that following the February 1993 accident, Johnson experienced pain in his neck, back, and left arm and hand. The back pain improved with physical therapy; however, Johnson continued to experience pain in his neck and left arm and hand. He was ultimately diagnosed with a ruptured disc at the C-6, C-7 vertebrae and underwent a cervical diskectomy and fusion to repair the ruptured disc. Johnson was subsequently returned to work without any restrictions. Dr. Clark testified that Johnson had only a 5% impairment rating as a result of the cervical diskectomy and fusion.
Immediately after returning to work, Johnson injured himself again in the area where he had recently had the cervical diskectomy and fusion; however, an MRI revealed no herniation in the cervical and lumbar areas of the spine. Johnson was treated for cervical radiculopathy and was returned to work with only a 30 — pound lifting restriction. Johnson worked without complaint from the time he returned to work on November 7, 1993, until he left work with pneumonia on January 23, 1994.
The record contains no evidence of a causal connection between the February 1993 injuries and the three surgeries Dr. White performed on Johnson in 1994. The court noted: "These surgeries were performed by Dr. James White in Gadsden, whose testimony was not before the Court. The Court notes that there is a pending action (CV-95-380) dealing with the causal connection between these three surgeries and the October 19, 1993, accident."
In fact, the evidence that was before the court indicates that the surgeries performed in 1994 and the injuries sustained in February and October 1993 were not causally connected. Before having the carpel tunnel surgery on his right hand, Johnson had made no previous complaints to his physicians regarding his right hand. The only problems Johnson had complained of regarding his hands involved his left hand. Additionally, Johnson himself testified that he did not complain of problems with his right hand until after he had had the lumbar laminectomy on April 8, 1994, which was approximately three months after he had last worked for the City. Further, the medical testimony presented indicated that Johnson's initial back pain had improved with physical therapy. Johnson made no complaints of back pain while he was under the care of Dr. Clark and Dr. Hrynkiw, and he made no complaints of back pain after he was released to return to work in November 1993. When Johnson had the surgery on his back in April 1994, he had not worked for the City in over two months. Finally, although the surgery performed on Johnson's cervical spine in July 1994 was in the same location as Johnson's first surgery on his cervical spine following the February 1993 injuries, no evidence was presented to indicate that the second surgery was in any way related to, or was the result of, an aggravation of the injuries sustained in February 1993.
Additionally, the vocational evidence presented by Bentley and Gurley does not support the court's judgment. Bentley testified that he relied primarily on the functional capacities evaluation in concluding that Johnson was 100% vocationally disabled. The functional capacities evaluation was performed over two years after Johnson had sustained the initial injuries in February 1993, and it evaluated Johnson's body as a whole following the three surgeries in 1994. As we have discussed above, the record contains no evidence indicating that the surgeries performed in 1994 were causally connected to the February 1993 injuries; therefore, any reliance upon the functional capacities evaluation in determining the extent of Johnson's disability based on the February 1993 *Page 1272 
injuries would be misplaced. Further, Gurley testified that he had assigned a zero disability rating to Johnson as the result of the February 1993 and October 1993 injuries, because Johnson had returned to work at his normal duties following his treatment for those injuries.
We are mindful of the harsh outcome of this case; however, there is simply no evidence in the record to support a finding that Johnson had suffered a 90% loss of earning capacity as a result of the injuries he sustained in February 1993. Accordingly, we must reverse the judgment and remand the case for further proceedings.
REVERSED AND REMANDED FOR FURTHER PROCEEDINGS.
MONROE and THOMPSON, JJ., concur.
ROBERTSON, P.J., and CRAWLEY, J., dissent.
[1] The accident on October 19, 1993, is the subject of a declaratory judgment action filed on April 13, 1995, by the Municipal Workers' Compensation Fund, Inc. The Fund had insured the City until July 31, 1993; it seeks an adjudication that it is not liable for the injuries Johnson sustained as a result of the accident on October 19, 1993. There is no indication in the record that Johnson amended his original complaint at any time to include the October 1993 accident. On April 21, 1995, three days after the trial of this case, counsel for Johnson moved to have the workers' compensation action and the declaratory judgment action consolidated, alleging that Johnson was 100% disabled as a result of the injuries he had sustained in February 1993 and had later aggravated, or as a result of the injuries he sustained in October 1993. Johnson sought to have the two cases consolidated for discovery purposes and to have the trial testimony that was presented in the workers' compensation trial be part of any evidence to be presented in the declaratory judgment action. The trial judge that was assigned the declaratory judgment action granted the motion to consolidate the cases for discovery purposes on May 24, 1995. At the time of this appeal, the declaratory judgment had yet to be tried.
[2] The record contains no testimony from Dr. White regarding these surgeries; however, it does contain several pages of Dr. White's notes that describe the surgical procedures.